was previously announced in time to be awarded to counsel. The first case today is number 181890, United States v. Greci Jimenez. Good morning, Your Honor. May it please the Court. My name is Rosemary Stapicio and I represent Greci Jimenez in this appeal. The appeal is from what we believe was an unreasonable sentence imposed by the District Court based on a loss calculation, an adjustment for sophisticated means, and an adjustment for leadership role. The driving force behind this sentence was the loss calculation. This was a mortgage fraud case where the allegations were that there was fraud in the inducement of a short sale. And the issue for the purposes of sentencing was how to properly calculate that loss. Now, I understand that this Court has indicated that the loss calculation, typically, if there is fraud in the inducement of the loan, is the originating loan price less the short sale. In this case, there was no fraud on behalf of my client. Well, there was fraud at the other end. Why does that make any difference? I mean, you have the, yes, the original loan amount was not fraudulently induced. That's true. But that number is still there. And then at the other end, you have these fraudulent short sales. That number is readily established. So what's wrong with subtracting that number, the short sale number, from the original loan amount to get a sense of the loss? Well, because in this case, it doesn't take into account the housing crisis. If the original loan was inflated by the lenders in this case, and the property was never worth the amount of the loan, then why should a defendant be held accountable for fluctuations in that market? So in this case, the bank went out and did an independent appraisal before the short sale. They had their own appraisers go out and do an independent appraisal for each and every property in which they decided to do a short sale. And the independent appraisal set the value of the property at that time. And the short sales were very close to the assessed value that was independent of the bank. And I would suggest that in this case, if there was fraud in the assessment, if they were indicating that the prices were inflated in some way, then absolutely the loss value should be calculated the way that the court calculated it. But in this case, because the banks themselves went out and did independent appraisals of these properties and came to what the fair market value was then after the implosion of the real estate market because of the mortgage fraud. That was the most amount of money they could get for the property at that time, according to them. And they reserved for themselves in the short sale the idea that they could then go after the original mortgage owner for any difference in that property. But isn't there evidence that these sales would never have taken place? Your assumption seems to be that the bank was in a position where there would have to be some kind of a foreclosure. That's not true. Well, the properties were all upside down. That was true. As a result of the housing crisis, every single property that was involved in the deal was upside down. Well, maybe prices turned around over time. That situation could have changed. Right. But can you expect that the original mortgage owners are going to be able to keep paying on properties that are $200,000, $300,000 less in value than what the original loan amount was? I think in that case, we have to look at what the fair market value was. And I think in addition to the fair market value, in order to make the lenders hold, if that's the goal of the loss calculation, the lenders reserved their right to go after the original buyers or the original mortgages. And so they had the right to go and then file whatever claim they wanted, even under the short sale, against the original people who took out the loan to get the difference. But to answer your question regarding isn't this all fraud, my suggestion would be no, it wasn't. So there wasn't enough, there wasn't evidence in the record to suggest that the letters that were known, the hardship letters, were in fact fraudulent. In this case, there was evidence that some of the hardship letters were generated by or at least requested by my client. There was evidence that some of the lawyers that were involved requested the hardship letters, but there wasn't economic evidence introduced to suggest that there wasn't a need for the hardship letters in the first place. And so the government is taking the position that it doesn't matter. In this case, it doesn't matter. The loss calculation is what it is. The court has spoken and that's it. And I say in this case, under these particular sets of facts, the loss calculation has to take into account what the market was doing at the time. If not, then each defendant gets then charged with the volatility of the market, and that would be unfair under these circumstances. Counsel, isn't it a fact, sort of taking another look, a different view of the situation, these were not arm's length transactions. So you had individuals now living in these homes as a result of these fraudulent transactions. That's absolutely the case. Okay. That's absolutely the case. So why isn't the difference between the original loan value, which was unsustainable, I gather, they now live in a house with a much reduced mortgage. Why isn't the difference between those two indebtednesses a measure of the gain, if you will, for those individuals who are now living in these homes as a result of these fraudulent transactions? Because the non-arm's length issue isn't what sets the price. That's not what sets the market price in this case. I think that that scenario would be correct if there was fraud in the loan origination. In other words, if there was something that happened with the loan origination that was fraud. But in this case, there's no claim that the original loan amount, at least on behalf of this defendant, was in any way fraudulent. So what? Again, the fraud comes at the other end. The fraud comes at the other end. And so what I suggested in my brief is because the fraud comes at the other end, then certainly two things could happen. One, the original mortgages could go after the original mortgage holders for whatever the difference is between the short sale and the original mortgage. They retain that right. And that's something that I think the court has to give somewhere. There needs to be credit somewhere. Is that clear legally? I thought in these short-term sales that an aspect was that the banks agreed not to go after the original borrowers for the full amount of the loan. I thought that's how these deals worked. Not all of them worked that way. And there's evidence in this case that at least with respect to some of the loans that Ms. Jimenez was involved in, and specifically the one that the bank did retain the right to go after the original mortgage owners for any default that may happen. And so the fact that the bank set the price, the fact that the bank in this case indicated that the fair market value was one position, they still retained that right to go after the original mortgage owners to be able to get any deficiencies. They don't necessarily have to go after a defendant in this case. And what I'm saying is if there was fraud in what happened in the non-arm's length transactions, if that's the fraud that we're focused on, then that would be a crime in the inducement of the new mortgage for the new people, not the old people. The problem with that argument for the government is they didn't list any of the new mortgages as victims in this case. They only listed the old mortgages as victims. And so if the court is correct that there was fraud in the inducement, which I agree there may have been, that's a fraud as it relates to the new mortgage, not as it relates to the old mortgage. And that's what I suggest is in the problem with the loss calculation here. Didn't the district court as an alternative calculate gain as the measure? Yes. It calculated gain understanding the loss calculation in the same exact respect. But for the gain, as I understand it, there's one transaction where there's some evidence that the bank retained the right to go after the original borrower. That's correct. But there isn't such evidence with respect to the other transactions. Well, I believe that the mortgages were, I think they're part of my record appendix. And I think that as far as the evidence is concerned, there was no evidence that they did not retain that right. Right. I know there is evidence at least in one mortgage that they did retain the right. But even if we used your formula with respect to that one transaction. Yes. We would still come out with an amount that would put us in the same guideline range unless we adjusted all the others as well. Well, I'm suggesting that all of them should be adjusted because if there was fraud for the Andre transaction, it was fraud in the inducement of a new loan. That argument necessarily presumes that we would presume that in the other transactions the bank retained both legally and practically the right to go after the borrower on the original note. You don't have to just do it that way. You can also look at what was happening at the time, which was the housing crisis. Well, at the time, in fact, banks generally didn't go after the original note on the short base. The fact that they didn't doesn't suggest that they couldn't. Just that they didn't. And I think it's more evidence of their own fraud. I mean, this was, you have to under, the banking industry in this case, the fact that it imploded was the bank's fault, not anyone else's fault that they were overreaching on mortgages. Wasn't the status quo ante that the borrowers were living in the house and were paying on the note, the original note? They were. Okay. That's the status quo ante. They had no lawful option other than fraud to both stay in the house and pay a lower amount. The only way they could get a lower amount was to do a short sale, which required them not to be staying in the house. I understand. May I answer the question? Sure. They could have chosen to let the bank foreclose on their property. They could have had somebody else purchase it and live right back in that property. Certainly the bank had the right to foreclose. It wasn't the only option for the bank at that point. And I would suggest if you look at, you have to evaluate this case as it's based on the industry. And I would ask you to look at what was happening in the industry and the fact that all of these loans were upside down when you tried to calculate the loss. Because the loss calculated here is unfair. It puts an unfair burden on the defendant for a market volatility. And I will rest on my brief because I'm out of time. Thank you. Ms. Bloom, good morning. Good morning, Your Honors. Sarah Bloom on behalf of the United States. As you have just been discussing, I think that the easiest way to recognize that the judge's loss calculation was reasonable is to look at the gain calculation. Here there is no dispute that each of these sellers got a reduction in the security on the mortgage on their property and got to stay in that property. That is a benefit. It's an undisputed benefit. In fact, I believe there was evidence in the record that most of them were released from their mortgage at that point. But whether or not they were released... Where is that in the record? Your Honor, I could not quickly put my hand on it. I apologize. But I know that that was argued before the district court. And the court decided that it didn't. The only one evidence that was not released was Ms. Jimenez's loan. And I will search for that and try to provide that. But in any event, there was no evidence... Are you going to file a letter? Yes, Your Honor. If you can't find it, also indicate it. Yes, Your Honor. I will do that. Thank you. In any event, it is clear that they were released from a secured debt, which is of significant value. Because if you're in the position of the bank, you're only really going to go in and know that you're releasing someone in a short sale because they said they were willing to move out, they couldn't pay for their house, and they had a hardship. It doesn't really make sense that you're going to pursue the unsecured debt that what you were holding onto was the mortgage debt. So the gain of getting that release of the mortgage debt is a gain to all of the people who sold their homes. Shouldn't we still, though, clarify for the district courts how to do the loss calculation itself? Because it does seem economically correct that if the banks did not release the promissor on the original note, and if they did an appraisal that showed that the market value of the house was the same as the short sale price realized by the bank, then there would have been no damage. I still think that there is a loss here because, as Your Honor has noted, it is not clear that the person living in the house would have given up paying and simply been foreclosed upon. In fact, part of the reason that people put down down payments and that banks lend at lower rates to people who are living in the home is they have an incentive to... But if they're still on the note, that takes... You know, on day one, the bank holds a note, and it holds a security, a house, and let's say the market appraisal of the house says it's $100,000. If they do a short sale and they realize $100,000, then after the short sale, they are holding the same note, which they have not surrendered, and $100,000 in cash. So there's no loss. No, I think there is because you're assuming that they are going to then... What could happen, in fact, what did happen here, what could have happened is the borrower stays in the house another three, five years, struggles through, and the house recovers its value. We don't calculate loss that way. We don't calculate loss that way. The house could have gone down in value. The bank would have been worse off. Market value anticipates the probability of a house going up or down in value, and people pay that. You could just as easily say that the $100,000 in cash that they realized and sent to the house would have been put into the bank's investment polio and realized even more money. So we calculate the loss as the day of the transaction, don't we? Right, but we calculate the loss as the... The argument here is that their alternatives here were only to foreclose, but as of the day of the transaction, that wasn't the only alternative. So I think that is putting... already assuming a speculation going forward. In terms of the evidence in the record, is it true with respect to all of the transactions that there was evidence that this notion that people underwater weren't going to live there anymore, weren't going to get out, they weren't going to stop making payments, the suggestion is that was simply contrived with respect to some of these transactions. Was that evidence contrived only with respect to some of the transactions, or is that evidence of contrivance applied to all of the transactions? I don't think the evidence in the record answered that question as to all of the transactions. There was evidence that some borrowers were told to stop making payments. There was evidence that hardship letters were fraudulent, but there was also evidence in the record that borrowers were financially distressed. Financially distressed is not... There was also evidence in the record that these borrowers wanted to stay in their homes and intended to stay in their homes. So I don't think there's one clear answer as to all 12 properties. If they were financially distressed, that undercuts the argument you just made that they might have stayed and continued paying at the higher note value for the undervalued house. Well, I think that there's a difference between saying that someone's financially distressed and that they have given up and are ready to move from their house and cannot make any payments or reach a modification, and that's, I think, the point. I would guess that there are lots of people who are in their houses today who were financially distressed during the financial crisis and whose houses' mortgage values were upside down at one point. So not everyone who is distressed or whose mortgage is greater than the house value at that moment leaves, and that's part of why a bank has homeowners in houses, why it treats them differently, because they have an incentive that is not just financial to stay in that home, to work it out, to try to make those payments and get through that financial distress, as many people do. And so the assumption that just because you're having trouble making your payments you're going to be in foreclosure and the bank is going to lose everything at that moment is in itself speculation. Counsel, there is in this case, and it probably doesn't matter at all given the purpose of the loss calculation, but there is an enormous disparity between the money that the defendant actually put into her pocket and the loss calculations where they're actually intended.  That is true, Your Honor. And I guess that your position, that just doesn't matter. Well, our position is that it's something that the court could have considered if it had, you know, in trying to decide whether this overstated the, whether the loss to the banks in some way overstated the defendant's culpability. And in this case, the court did go well below the guidelines, albeit for other reasons. When there's discussion in this case about gain, for example, and the gain is in that range of over $2 million, that's not personal gain to her. I mean, she participated in the scheme which, for others involved, you put together the gains for all of the participants, co-conspirators, people left in the homes. That's over $2 million. But in terms of what she personally realized, that is a much smaller number. That is correct, Your Honor. But I think that the court's calculation, for purposes of doing the guideline calculation of gain or loss, was correct and was certainly reasonable and based on the court's actual findings as to what was established before the court about what the alternatives were. I assume it's your position that that very small number for personal gain, that would not be a fair measure of her criminal accountability for the scheme in which she participated. That is correct because the impact to the victims, the banks, was the loss of the secured debt to a very large number. And, in fact, as I think we demonstrated with a chart to the district court, the benefit obtained was quite significant to the group of conspirators when these did rebound, and that really was a loss to the bank had they stayed in their homes until the property rebounded, in which case they would have had to pay those mortgages instead. The borrowers were realizing hundreds of thousands of dollars of equity in their homes because the mortgages had been removed. So if there are no further questions on loss, I don't know whether the court wants me to address any of the other issues. Clearly, the role and sophisticated means were based on a fact-based determination. As to the substantive reasonableness, this defendant was not similarly situated to the other co-defendants based on differences in cooperation, differences on role, different judge's sentencing, and differences in early acceptance. If there's no further questions, I will rest on the briefs. Thank you. Thank you. Thank you.